3 A.3d 545 (2010)
416 N.J. Super. 46
Bonnie ANDERSON and John R. Anderson, Plaintiffs-Respondents,
v.
A.J. FRIEDMAN SUPPLY CO., INC., A.J. McNeil Co., Inc., A & M Wholesale Hardware Co., A.W. Chesterton, Co., Inc., Afton Pumps, Inc., American Industrial Supply Corp., Inc., American Standard, Inc., Atlas Turner Inc., Avocet Enterprises, successor to Vent Fabrics, Inc., Bryant Manufacturing Co., a division of Carrier Corp., BW/IP International Company, f/k/a Borg Warner Industrial Products Inc., a former subsidiary of and successor to Borg Warner Corporation,
Byron Jackson Pumps, and United Pumps & Compressors, Calon Insulation Corp., Central Jersey Supply Company, C.E. Thurston & Sons, Inc., CertainTeed Corporation, formerly CertainTeed Products Corp., individually and as successor to Keasbey & Mattison Company, Chicago Bridge & Iron Company, Clark-Reliance Corporation, Cleaver Brooks Co., Collins Packing Co., Conval Inc., Cooper Industries, Inc., Cooper-Crouse Hinds, Crane Co.,
Crown Cork & Seal Company, Inc., individually and as successor to Mundet Cork Corporation, Dana Corporation, individually and as successor to Spicer Enterprises, Inc., and Victor Gaskets, DB Riley, Inc., individually and as successor to, and/or f/k/a DB Riley Stoker Corporation, and as successor to, and/or formerly doing business as Union Iron Works, Duct Mate Industries, Inc., Dunham Bush, Inc., Eastern Refractories Co., Inc., E & B Mill Supply Co., Elizabeth Industrial Hardware Co., a/k/a Elizabeth Industrial Supply Co., a division of Guyon General Piping, Inc.,
EMCO Fittings, Inc., individually and as successor to EMCO Stainless, Inc., Fisher Controls International, Inc., the Flintkote Company, Flowserve Corporation, individually and as successor to Duriron Company, Inc., Valtek Control Valves, and Wilson-Snyder Pumps, Ford, Bacon & Davis, Incorporated, Foster Wheeler Energy Corp., Furino & Sons, Inc., Garlock, Inc., General Refractories, Co., General Electric Co., Georgia Pacific, Inc., Goodyear Tire and Rubber Company and Goodyear Canada, Inc., Gorman-Rupp Company, Inc.,
Greene Tweed & Company, Goulds Pumps, Inc., H.B. Smith, Inc., Hudson Iron and Metal Company, Ideal Supply Company, IMO Industries, Inc., as successor to and f/k/a DeLaval Turbine, Transamerica DeLaval, and IMO DeLaval, Industrial Welding Supply, Inc., Ingersoll-Rand Co., J.H. France, John Crane, Inc., ITT Corporation, as parent of Bell & Gossett Division, The Johansen Company, John W. Wallace & Co., John Zink Company, individually and d/b/a Gordan-Piatt Energy Group Inc.,
Joule, Inc., individually and as successor to Joule Industrial Contractors, Kewanne-Ross Corp., individually and as a division of American Standard, Inc., Koenig Industrial Supply, Inc., individually and as successor to Koenig *546 Hardware Company, Kraemer Gunite, Inc., La Bour Pump Co., Inc., Lawrence Pumps, Inc., Lennox Furnace Co., a/k/a Lennox Industries, Inc., Madsen & Howell, Inc., Magnatrol Valve Corporation, Marsam Valves & Fittings Corporation, Masoneilan International, Inc.,
Melrath Supply & Gasket Co., Inc., Milton Roy Company, Moser Brothers, Inc., National U.S. Radiator Division of Crane Co., Neles-Jamesbury, Inc., North Carolina Enterprises Co., Inc., as successor to EMCO Wheaton, Inc., individually and as successor to EMCO Stainless Inc., Pacific Steel Boiler Division of Crane Co., Petroleum Heat & Power Co., Inc., Pfaulder United States Inc., a/k/a Pfaulder Companies, Inc., Pfizer Inc., Pulmosan Safety Equipment Corporation, Quigley Co., Inc.,
Rapid-American Corporation, individually and as successor-in-interest to Phillip Carey Manufacturing Corp., Raritan Supply Company, individually and as successor to Bridge Supply Co., Raytheon Engineers & Constructors, Inc., individually and successor to United Engineers & Constructors, Inc., Record Industrial Company, Ring-O-Valve Incorporated, Robert A. Keasbey Co., Rockwell Manufacturing Company, Rosemount, Inc., Rutland Fire Clay Co., d/b/a Rutland Products, Safeguard Industrial Equipment Co.,
Schiavone-Bonomo Corporation, Slingman Industries, f/k/a Slingman Industrial Supply Company, Spirax Sarco Company, Inc., individually and as successor to Sarco Company, Inc., State Insulation Corp., Sterling Plastics and Rubber Products, Inc., Stewart-Warner Corp., Strahman Valves Inc., SVI Corporation, individually and as successor to Stockholm Valves & Fittings, Inc., T.J. McGlone & Co. Inc., the Anchor Packing Co., the Foxboro Company, the Walworth Company, Trilco Supply Company,
Union Pump Co., Union Carbide Corp., Uniroyal, Inc., a/k/a U.S. Rubber Co., Utica Boilers, Inc., Viking Pump Co., Inc., Viacom Inc., successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation, Weil McLain, a division of The Marley Co., as successor-in-interest to Wylain Co., Welco Gases Corporation, Woolsulate Corporation, Worthington Corp., Yarway Corporation, formerly Yarnell Waring Company, York Industries Corp., Pulmosan Safety Equipment Co., and Infineum U.S.A., L.P., individually and as successor-in-interest to Enjay Chemical Company, Defendants, and
Exxon Mobil Corporation, Defendant-Appellant, and
Durabla Manufacturing Company, Defendant/Third-Party Plaintiff,
v.
Goodyear Tire and Rubber Company and Goodyear Canada, Inc., Third-Party Defendants.
Docket No. A-5892-07T1
Superior Court of New Jersey, Appellate Division.
Argued April 26, 2010.
Decided August 20, 2010.
*549 Christopher J. Keale argued the cause for appellant (Sedgwick, Detert, Moran & Arnold, L.L.P., attorneys; Michael A. Tanenbaum, Newark, of counsel and on the brief; Mr. Keale, on the brief).
Arnold C. Lakind, Lawrenceville, argued the cause for respondent (Szaferman, Lakind, Blumstein & Blader, P.C., and Levy Phillips & Konigsberg, L.L.P., attorneys; Mr. Lakind, of counsel and on the brief; Moshe Maimon, on the brief).
Before Judges RODRÍGUEZ, REISNER and CHAMBERS.
The opinion of the court was delivered by
A.A. RODRÍGUEZ, P.J.A.D.
In this novel asbestos litigation, plaintiffs Bonnie and John R. Anderson, husband and wife, allege that Bonnie contracted mesothelioma from one or both exposures to asbestos at the Linden Bayway Refinery owned by defendant Exxon Mobil Corporation ("Exxon"). The first was bystander exposure from laundering John's asbestos-laden work clothes during his employment with Exxon from 1969 to 2003. The second was direct exposure during Bonnie's employment with Exxon from 1974 to 1986. Plaintiffs prevailed on their claim that Bonnie's bystander exposure was a substantial factor in her contraction of mesothelioma. Exxon now appeals from a judgment in favor of plaintiffs, awarding $7 million to Bonnie and $500,000 per quod to John, plus pre-judgment interest. We affirm.
These are the facts relevant to this appeal. Bonnie is now sixty-one years old. She married John in 1967. They have one daughter, born in 1968, and one granddaughter. In 1974, Bonnie graduated with a college degree in elementary education and library science.

John's Employment With Exxon
In 1969, and until his retirement in 2004, John held various jobs in one of Exxon's chemical plants. After three months of training, he worked until 1975 as a chemical process operator repairing pumps and filters, which required initial removal of all covering insulation. Using chisels and hand tools, and sometimes his bare hands, he would pull the insulation off in chunks. Dust would fly everywhere. Exxon used insulation on all pumps, compressors, filters, and valves. He also would dump whole bags of raw insulation into the tanks to seal holes in the filters and would put that same material into coffee cans when he had to repair the filters by hand.
Although Exxon conducted safety meetings and provided helmets to its employees at this time, it never supplied respirators or uniforms nor warned that the dust contained *550 asbestos. John never knew what kind of insulation it was. He worked in his own street clothes, which Bonnie always laundered. Standing near the washing machine, she would shake out as much dust as possible. She often complained about the dust in his clothes and hair.
Starting in 1975, John worked for three years as a console operator inside a control room. Although the work was less dusty, he also worked overtime hours removing insulation and repairing equipment. Exxon had begun supplying gloves to its employees, but management never told John not to wear his work clothes home, nor warned him that the insulation was hazardous.
Starting in 1979, and until his retirement, John worked as an instrument technician. Although he still came into contact with asbestos insulation, his clothes were "much cleaner." Exxon had begun supplying lockers, showers, and uniforms. John, however, often worked in his own clothes or took his uniform home for Bonnie to launder, because the chemicals used by Exxon's laundry service gave him a rash. He never used the showers.

Bonnie's Employment With Exxon
In 1975, Bonnie began working at Exxon's Bayway Refinery. She trained in different jobs around the refinery for three years, but never worked in the chemical plants. She would use solvents to remove rust around "more liquidy-type components" and "high pressure steam water to wash [pipes] out." Exxon provided no uniforms, and her "clothes would be wet," "[r]eal grimy," and "[g]reasy, oily." "[She] didn't get very dusty. [She] was more grimy." Although she worked in some areas where insulators "were putting on insulation," she could not remember ever working near anyone removing insulation, nor personally working with or disturbing any asbestos or thermal insulation, nor being told that any of the materials she was using or coming into contact with contained asbestos.
After training, and until she left Exxon in 1986, she worked as an electrician. She disconnected, dismantled, cleaned, and reinstalled electrical breakers, relays, and switches in the refinery's substations. She even "sledge hammered four-inch piping" while dismantling an older substation. Only in one substation did she see a sign warning of dangerous asbestos. She and her coworkers "looked around ... [but] couldn't see anything," so they "went in... and worked, did our job ... for probably at least a week." However, she never disturbed insulation in any substation because "one little piece of dust would trigger something to shut down" and "if you shut things down in a refinery, [those things] blow up."
From 1964 until 1978, Bonnie used hormone therapy and prescription narcotics to regulate her menstrual cycles and control dysmenorrhea (severe menstrual pain and excessive bleeding during her cycles). In 1988, after being diagnosed with endometriosis and recurrent pelvic inflammatory disease, she had an oophorectomy and a total abdominal hysterectomy. Afterwards, her pain was gone. After leaving Exxon in 1986, she worked as a school librarian until 2004.

Mesothelioma Diagnosis
In 2001, she started having severe stomach pains and swelling. After a CT scan showed fluid in her abdomen, she had exploratory abdominal surgery. During the laparotomy, the surgeon took out six quarts of fluid, saw "multiple tumor implants," which he described "as a carpet-like implant on the pelvic peritoneum and other implants on the bowel [and] in the *551 omentum." The surgeon diagnosed her with malignant peritoneal mesothelioma.
Mesothelioma is a "rare" cancer that develops in the linings that surround various body cavities, such as the pleural cavities enclosing the lungs, the peritoneal cavity enclosing the abdomen, or the pericardial cavity enclosing the heart. A "Final Joint Pretrial Order" indicates that "[t]he parties have stipulated that [Bonnie] suffers from malignant mesothelioma[, but Exxon] does not, stipulate that the malignant mesothelioma is asbestos related."
Bonnie was referred to Dr. John Chabot, a surgeon, and Dr. Richard Taub, M.D., an oncologist. They put her into a "Phase II clinical trial." Over the next ten months, she had two more surgeries, numerous heated and traditional chemotherapy sessions, and five and a half weeks of radiation.
In 2002, Chabot performed a surgical debulking, a procedure to remove as many tumors as possible. He found lesions in her abdominal cavity, more abdominal fluid, thickening of the omentum, enlarged lymph nodes, a small lung nodule, some lung scarring, and four liver lesions. He completely removed her omentum and two liters of abdominal fluid, and he inserted two ports so chemotherapy could be administered directly into her abdominal cavity. Chabot and Taub reviewed the pathology and confirmed her diagnosis of mesothelioma.
Bonnie began chemotherapy. During the treatments, she experienced severe abdominal pain, fatigue, depression and weakness. She required psychiatric treatment, blood transfusions for anemia, and narcotic drugs for pain. Chemotherapy continued three times a week for eight sessions and then once a week for four sessions.
After chemotherapy, she began a treatment program of gamma interferon, which induced constant flu-like symptoms. After a few weeks, Bonnie had follow-up surgery to remove additional tumors and to administer heated chemotherapy directly into her abdomen. She weighed 100 pounds.
In January 2003, she began radiation, which was scheduled for seven weeks. She became so weak that she was confined to a wheelchair. She insisted that the treatments stop because of the pain and because the radiation produced complications, including inducing hairy cell leukemia (a cancer of the lymph nodes and lymph cells), severe anemia, and bone weakening. She required a partial hip replacement. She still must undergo yearly scans to monitor her condition.
Taub testified that asbestos caused Bonnie's mesothelioma, but he could not say with certainty when she had been exposed. He stated that she still has "two foci of disease above the liver," and she eventually will die of her disease. He "firmly disagreed ... that the disease is curable." He has never "been able to totally get rid of [it] ... [and was] not sure we can get rid of it in anybody." Reoccurrence and progression occur in sixty to sixty-five percent of patients. "[M]ostly it grows back in the abdomen and causes intestinal obstruction" and "chronic pain," but it also "may metastasize." The average survival rate is almost six years, but "people are living a long time with it." It affects the quality of life.

Lifestyle
Prior to Bonnie's illness, plaintiffs were very active. They enjoyed horseback riding, hiking, camping and traveling. They often visited North Carolina, where they camped and fished. After Bonnie became sick, John took over all of the household chores, except laundry, which Bonnie continued *552 to do. He became her "caregiver and he took care of everything," as she was often so weak that he had to carry her to the bathroom or hold her up in the shower.
After Bonnie's last treatment, plaintiffs went on a cruise to Alaska. During that trip, they took a lot of trains and buses, but Bonnie was still very weak and she often went to bed right after dinner. John spent a lot of time alone and had to give her "procrid shots" for her blood.

Lawsuit
Plaintiffs' complaint asserted various products liability claims against Exxon and numerous defendants that manufactured and supplied asbestos. Plaintiffs sought compensatory and punitive damages, and John filed a per quod claim. Exxon answered and moved for summary judgment, arguing that plaintiffs' claims were barred by the exclusive remedy provisions of the Workers' Compensation Act (WCA), N.J.S.A. 34:15-1 to-69.3. Judge Ann G. McCormick issued an oral opinion denying the motion without prejudice. After discovery, Exxon moved for summary judgment again, renewing its argument that plaintiffs' claims were barred by the WCA. The judge denied the motion in a January 12, 2007 oral decision.
Before and during trial, the claims against other defendants were dismissed. The trial proceeded only as to Exxon.

Dr. Moline's Testimony
Jacqueline Moline, M.D., an expert in occupational and environmental medicine, testified that asbestos is a mineral extracted from underground deposits. It has small fibers that become airborne or get into dust and then lodge deep in a person's lungs. "[O]ften people don't know they've been exposed," so they continue to work with it. In fact, the Occupational Safety and Health Administration (OSHA) did not create a permissible exposure standard (PEL) until 1970.
Asbestos exposure can cause three diseases: (1) asbestosis (non-malignant scarring of the lungs); (2) lung cancer; and (3) mesothelioma. They can develop years after the last exposure. Mesothelioma requires the lowest exposure amount and can develop from the cumulative effects of minimal and infrequent exposures. It has an average latency period of thirty years from exposure to diagnosis.
Moline has seen mesothelioma develop in people who have had no occupational asbestos exposure, but who were living with family members working with or near asbestos in their jobs. "[T]raditionally it's been the wives or sometimes the daughters... [who] are laundering the [employee's] clothes" and become sick. According to a study done by Exxon, John worked for ten years in a job classification, which had the second highest asbestos exposure levels at the Bayway complex. A 1981 study showed the presence of asbestos at the complex and found workers in 1986 showing signs of asbestos-related diseases.
Moline reviewed Bonnie's medical records and noted that Bonnie "was getting very aggressive treatment." However, mesothelioma has no cure and Bonnie will likely die from it. Moline said "[i]t's impossible to separate out which exposure on which day or which month or which year actually cause[d] ... [Bonnie's] disease.... We consider that each and every exposure contributes to mesothelioma." She opined that "there's no way of knowing which exposure" caused Bonnie's mesothelioma. Rather, "each of these contributed to the development of her mesothelioma, and it's impossible to separate those out."

*553 Dr. Castleman's Testimony

Barry Castleman, Ph.D., an expert in public health, described the history of asbestos and the current medical and scientific reports on its hazards. He opined to a reasonable degree of scientific certainty that Exxon's management knew by 1969 that asbestos exposure caused diseases, including mesothelioma, among the workers and their families. He explained that, for over 100 years, people have known asbestos causes disease. In the 1920's, that disease was called asbestosis, and in the 1930's, asbestosis was discovered to have a latency period of "five years or more" no matter how high the exposure. The first articles warning that asbestos caused mesothelioma in shipyard insulation workers were published in 1968. Exxon's predecessor reported in a 1948 article that companies should provide laundry services for workers exposed to toxic and carcinogenic materials to reduce disease risks to those workers and their families. In fact, a 1965 British report concluded that "all it takes was household contact or neighborhood exposure to cause mesothelioma."

Exxon's Witnesses
Exxon presented three expert witnesses to contest liability and causation. Gerald Kerby, M.D., an expert in internal and pulmonary medicine, testified based only on his review of asbestos-related medical literature and not on his own medical training or experience. According to the literature he reviewed, only a few hundred of the over 2,500 to 3,000 reported mesothelioma cases were peritoneal mesothelioma. And, only about twenty to thirty percent of all such cases in women could be linked to past asbestos exposure. The average survival of a woman with peritoneal mesothelioma was between six and eighteen months from diagnosis, and it was "highly unusual" to see anyone surviving five years or more. Studies showed that most of the asbestos-related diseases occurred in people working in asbestos mines or directly with insulation, like shipyard workers.
Kerby was not aware of any epidemiological studies of household contacts from petrochemical and refinery workers, although some studies indicated that wives of shipyard insulators had been diagnosed with mesothelioma. Kerby agreed with plaintiffs' experts that: (1) a connection between asbestos and asbestosis was suspected around 1900, and the first case was reported in the medical literature in 1924; (2) a connection between asbestos and mesothelioma was seen in 1940, but all of the textbooks say it was 1960; (3) during 1965 to the late 1970's, "it became recognized that a lower dose of asbestos could cause mesothelioma than was necessary to cause asbestosis and lung cancer," which led to the recognition that people who worked near asbestos, but not necessarily with it, were also at risk; and (3) it was generally accepted by 1979 that workers' dusty clothes were exposing family members to asbestos.
Gerhard Raabe, Dr.PH, testified as an expert in the epidemiology of asbestos-related diseases in the petrochemical industry. He declared that mesothelioma was not a codifiable disease with its own classification until the 1980's, and it is "about five to six times more common in men than women." In 1986, eight cases were found in one refinery, and all of the diagnosed workers had been hired before 1956. In fact, there was no epidemiological evidence in the literature showing petrochemical workers hired after 1950 were at an increased risk for developing any asbestos-related diseases. And, there have been only thirty-seven worldwide cases of mesothelioma caused by household exposure to dusty asbestos-laden *554 work clothes worn by other family members, and none of those cases involved refinery or petrochemical workers.
On cross-examination, Raabe admitted knowing of numerous mesothelioma cases in refinery workers hired after 1950, and many of these workers had not been insulators. He also agreed with plaintiffs' experts that: (1) the only epidemiologically established cause of mesothelioma is asbestos exposure; (2) it is "commonly accepted today that it's possible" that "women can get mesothelioma from asbestos dust brought home on the clothing of a husband or parent"; and (3) mesothelioma has an average latency period of thirty-two years.
Finally, William Lee Dyson, an industrial hygienist, testified about historical standards and risk assessments for asbestos-related diseases. In 1946, before OSHA adopted its first PEL standard, the American Conference of Governmental Industrial Hygienists adopted a threshold asbestos exposure level in the textile industry of five million particles per cubic foot of air. In 1968, the standard was changed to two million particles per cubic foot and twelve fibers per cubic centimeter. Refinery workers, however, are exposed to significantly less asbestos than workers in textile manufacturing. Based on that information, and on John's testimony that he had handled raw asbestos only a few times, Dyson opined that John, as a process operator hired in 1969, was merely a bystander to asbestos removal and had no increased risk for asbestos-related diseases. Therefore, Bonnie, by extension, had no risks at all from John's work clothes.
At the close of plaintiffs' case-in-chief, Exxon moved for judgment. The judge denied the motion. The motion was renewed at the close of all the evidence. The judge reserved decision.
After charging the jury on Exxon's duty, the judge instructed that it had to determine whether: "Exxon had breached the duty it owed to plaintiffs; Bonnie "has peritoneal mesothelioma;" and Bonnie's "exposure to the asbestos brought home" on John's clothes "was a proximate cause of [Bonnie's] mesothelioma." The judge explained that: there could "be many proximate causes of an injury or a disease and there can be many substantial contributing causes;" asbestos brought home by John "need not be the sole cause of plaintiff's asbestos-related injuries [but i]t must be a substantial contributing factor;" and if the jury were to "find that [Bonnie]'s exposure occurring during the course of her employment was the sole cause of her injury or disease," it should return a verdict for Exxon.
The jury found that: plaintiffs had proven that Bonnie has "asbestos related Peritoneal Mesothelioma;" Exxon breached a duty owed to Plaintiffs; Exxon's breach was a proximate cause of Bonnie's disease; Bonnie was awarded $500,000 in compensatory damages. The jury did not award John damages for past and future loss of consortium. There was an immediate trial on punitive damages before the same jury. The jury awarded no punitive damages.
Plaintiffs moved for a new trial on damages or, in the alternative, for additur. Judge McCormick granted a new trial on damages. We denied Exxon's motion for leave to appeal. No. M-3817-07 (App.Div. Apr. 7, 2008). Exxon moved for a new trial on all issues. The judge denied the motion. We denied Exxon's motion for leave to appeal. No. M-4748-07 (App.Div. May 15, 2008).

Second Damages Trial
In the second trial on damages, the jury heard from plaintiffs, Taub, and Mary Hesdorffer, a nurse practitioner involved *555 in Bonnie's care. Exxon presented Dr. Allen Robert Gibbs, an expert in pathology and in the clinical course and survival of women with mesothelioma. Neither Hesdorffer nor Gibbs had testified at the previous trial. The jury awarded Bonnie $7 million and John $500,000. The judgment ordered prejudgment interest of $1,717,397.26 for Bonnie and $122,671.23 for John, and post-judgment interest.
Exxon appeals, arguing that the exclusive remedy provisions of the WCA barred plaintiffs' recovery and that the judge erred in several evidentiary rulings and by granting plaintiffs' motion for a new trial on damages while denying Exxon's motion for a new trial on all issues.

Workers' Compensation Act
Exxon contends on appeal that the judge erred by not granting summary judgment against plaintiffs because the claim was barred by the exclusive remedy provisions of the WCA. We disagree.
This case presents a novel scenario of a single injury arising after a long latency period caused by one of two, or both, asbestos exposures. The source of the responsible exposure ultimately controls the legal basis of recovery. Rule 4:46-2(c) requires that a judge ruling on a summary judgment motion must decide whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. The judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). The trial court may not weigh the evidence, resolve credibility conflicts, or make its own findings of fact; its role is limited to deciding whether disputed questions of material fact exist. Ibid. The judge must give the non-moving party the benefit of all favorable inferences. Id. at 536, 666 A.2d 146. But "when the evidence `is so one-sided that one party must prevail as a matter of law,' ... the trial court should not hesitate to grant summary judgment." Id. at 540, 666 A.2d 146. Our standard of review is de novo, using the same standard. Turner v. Wong, 363 N.J.Super. 186, 198-99, 832 A.2d 340 (App. Div.2003).
Judge McCormick, in her oral decision denying Exxon's second summary judgment motion, characterized the issue here as one of "dual exposure" and that it was "clear now" from the Supreme Court's ruling in Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 895 A.2d 1143 (2006), that a cause of action could "be asserted by a person who has a secondary exposure" to asbestos, such as "washing the clothes of the spouse which had the asbestos dust on the clothes." In Olivo, the issue was "whether a landowner can be liable for injuries allegedly caused from asbestos exposure experienced by the wife of a worker who had performed welding and steam fitting tasks that brought him into contact with asbestos on the landowner's premises." Id. at 398-99, 895 A.2d 1143. The plaintiff in Olivo was an independent steamfitter hired to work at Exxon's refinery in Paulsboro, and he filed a wrongful death action against Exxon and various asbestos suppliers and manufacturers after his wife died from mesothelioma, allegedly from laundering his asbestos-laden work clothes. Id. at 399-400, 895 A.2d 1143. Exxon filed a summary judgment motion asserting that it owed no duty to the wife because she had never been on Exxon's premises. Id. at 399, 895 A.2d 1143. The trial judge granted the motion, but we *556 reversed, and the Supreme Court affirmed that reversal. Ibid.
The Court explained that the question of whether a duty of care existed is one of foreseeability of harm, and once the ability to foresee harm is established, fairness and justness govern whether the imposition of the duty is warranted. Id. at 402-03, 895 A.2d 1143. It approached the issue of the duty owed by Exxon to the worker's wife as one of landowner liability. Id. at 402-03, 895 A.2d 1143. Because Exxon had been aware as early as 1937 that asbestos exposure was associated with asbestos-related diseases, the risk of injury to the wife "is one that should have been foreseeable." Id. at 404, 895 A.2d 1143. That is,
to the extent Exxon Mobil owed a duty to workers on its premises for the foreseeable risk of exposure to friable asbestos and asbestos dust, similarly, Exxon Mobil owed a duty to spouses handling the workers' unprotected work clothing based on the foreseeable risk of exposure from asbestos borne home on contaminated clothing.
[Id. at 404-405, 895 A.2d 1143.]
In fact, because it would have been easy for Exxon to provide warnings to its workers about the handling of their clothing or to provide protective garments, the Court did "not hesitate to impose a derivative duty on Exxon" for injury to a worker's spouse "caused by exposure to the asbestos... brought home on [work clothes]." Id. at 405, 895 A.2d 1143. Once the ability to foresee harm was established, fairness and justness extended the duty to the wife. Ibid.
However, the Court held that there were genuine issues of material fact still remaining as to (1) whether asbestos exposure was a known risk incidental to the specific work being performed by the worker, (2) the nature and scope of the work he was hired to perform, and (3) the extent of Exxon's supervision and control of that work. Id. at 407-408, 895 A.2d 1143.
The question for the judge here was whether Bonnie could continue to assert a claim against Exxon "when she was only exposed as a result of washing the clothes... [b]ut also, even during the time that she was the employee [and] had the additional exposure of washing the clothes." As to that issue, the judge discussed the "dual persona doctrine" as set forth in Arthur Larson, Larson's Workers' Compensation Law, Vol. 6, § 113.01[1], p. 113-2 (2009):
An employer may become a third person, vulnerable to tort suit by an employee, if  and only if  it possesses a second persona so completely independent from and unrelated to its status as employer that by established standards the law recognizes that persona as a separate legal person.
Even though the judge found no "case anywhere identical to this case," she declared:
[T]his is a case ... clearly, of an entity being a dual persona, having a[n] employer capacity for an eight year period, but then having a relationship to [Bonnie] as a bystander for 20 years. And it seems to me in that situation, it would be completely unfair to the plaintiff not to let her pursue her claim based on her bystander exposure, which had absolutely nothing to do with her employment relationship with Exxon.
Accordingly, finding that Exxon had a "dual persona" the judge "let the case proceed on the bystander exposure."
The judge reasoned "there is no question" that Exxon legally had "a duty to the spouse." Once Exxon had a duty to John as an employee to exercise reasonable care *557 and provide a safe workplace, that same duty was extended to his spouse "as a matter of law." The judge explained that plaintiffs could recover in tort if they could prove that (1) Bonnie's mesothelioma was caused from exposures while she was not employed by Exxon, or (2) Bonnie's bystander exposure was the substantial cause of her mesothelioma.
We agree with the soundness of this analysis. The dual persona doctrine would apply in situations when the employer has undertaken a completely separate and independent role with respect to the employee.
If the dual persona doctrine is to apply, it must be possible to say that the duty arose solely from the non-employer persona, rather than the other way around. For only in such a case can the second persona be really distinct from the employer persona. In other words, it is not enough ... that the second persona impose additional duties. They must be totally separate from and unrelated to those of the employment.
[Larson, supra, at § 113.01[4], p. 113-10.]
In our view, the judge's decision here to apply the dual persona doctrine is buttressed by the Supreme Court's pronouncement in Olivo, supra, 186 N.J. at 405, 895 A.2d 1143, to impose a separate duty on employers for injuries to a worker's spouse caused by bystander exposure to the asbestos brought home on work clothes. That is, although Exxon could not be held liable to Bonnie based on her direct occupational exposure, it could be held liable pursuant to Olivo, based on her separate exposure to the asbestos brought home by John from his Exxon job.
Thus, consideration of the relevant legal principles in light of the disputed evidence presented on the summary judgment motions leads us to the conclusion that there were genuine issues of material fact about the actual extent of Bonnie's and John's exposures to asbestos, which precluded summary judgment. Whether Exxon could be held liable pursuant to the dual persona doctrine require a jury determination. Thus, we affirm the judge's denials of summary judgment.

Jury Verdict Sheet
Exxon contends that the judge erred by not asking the jury to allocate liability between Bonnie's direct asbestos exposure as an Exxon employee and any bystander exposure. We disagree.
At trial, the judge viewed Exxon as "stand[ing] in two different pairs of shoes" even though there were no other defendants. Thus, Exxon asked her to list it twice on the verdict sheet, and to direct the jury to allocate fault between Bonnie's direct asbestos exposure as an Exxon employee and any bystander exposure from washing John's work clothes. She refused, reasoning that the jury could not allocate fault to Exxon as Bonnie's employer, because Exxon was immune from suit pursuant to the WCA.
Exxon now argues, relying on N.J.S.A. 2A:15-5.2 and -5.3 of the Comparative Negligence Act (CNA), N.J.S.A. 2A:15-5.1 to -5.8, that a new trial is required because the verdict sheet should have "list[ed] all potential tortfeasors," especially after the judge determined on summary judgment that Exxon really had a dual persona. We reject this argument.
The CNA provides that fault shall be allocated among each "party" in the case. N.J.S.A. 2A:15-5.2. Here, Exxon is seeking allocation of fault between its status as Bonnie's employer and its status as John's employer. However, the workers' compensation bar precludes it from being a party in this litigation in its status as *558 Bonnie's employer. N.J.S.A. 34:15-8; Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 181, 501 A.2d 505 (1985); see also Ramos v. Browning Ferris Ind., Inc., 103 N.J. 177, 184, 510 A.2d 1152 (1986) (stating that "a third-party tortfeasor may not obtain contribution from an employer, no matter what may be the comparative negligence of the third party and the employer"). The Court has squarely held that an employer is not subject to contribution liability pursuant to the CNA. Ramos, supra, 103 N.J. at 194, 510 A.2d 1152; see also Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 115, 853 A.2d 940 (2004) (stating in dicta that "an employer cannot be a party to a negligence action and thus can never be considered a joint tortfeasor subject to the [CNA]"). The fact that Exxon holds a dual status in this case does not change the application of this law.
As a result, there was no need to allocate responsibility between Bonnie's direct exposure as an Exxon employee and her bystander exposure. By examining the evidence presented and using the substantial factor standard in her charge on proximate cause, the judge properly instructed the jury on how to evaluate the overall significance of Bonnie's separate exposures to medical causation. We emphasize that the jury found Exxon liable after being instructed that if it were to "find that [Bonnie]'s exposure occurring during the course of her employment was the sole cause of her injury or disease," it should return a verdict for Exxon.
Moreover, even if the evidence is viewed in a light most favorable to Exxon, the jury could not reasonably conclude that any direct occupational exposure to asbestos during Bonnie's employment at Exxon caused her mesothelioma. Exxon produced no witnesses disputing her testimony that she never disturbed insulation on the wires or pipes, nor worked with asbestos or in close proximity to anyone removing or applying it. Further, in toxic or environmental tort actions where it is not possible for the jury to apportion negligence or fault, the recovering party "may recover the full amount of the compensatory damage award from any party determined to be liable." N.J.S.A. 2A:15-5.3(d)(1).

Grant Of New Trial On Damages
Exxon contends that the judge erred when she vacated the jury award and granted plaintiffs' motion for a new trial on damages. In the alternative, it argues that she erred by denying its motion to hold a new trial on both liability and damages. We disagree.
Trial judges may grant motions for a new trial if juries award insufficient or excessive damages. R. 4:49-1(a). The scope of a new trial "depends on the nature of the injustice." Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 490, 779 A.2d 1078 (2001). An award, nevertheless, should not be disturbed unless it clearly and convincingly appears to the judge that the jury's award is plainly wrong, constitutes a manifest injustice, or is so disproportionate to the injury as to shock the judge's conscience. Rendine v. Pantzer, 141 N.J. 292, 312, 661 A.2d 1202 (1995); Carey v. Lovett, 132 N.J. 44, 66, 622 A.2d 1279 (1993); Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977). Believing only that an award is lower than expected is not enough. Lombardo v. Hoag, 269 N.J.Super. 36, 57, 634 A.2d 550 (App.Div.1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994).
A basic precept of the judge's assessment is to view the evidence in the light most favorable to the non-moving party. Mahoney v. Podolnick, 168 N.J. 202, 229-30, 773 A.2d 1102 (2001). The *559 standard of appellate review is similar, Rule 2:10-1, except that the court defers to the trial judge's "`feel of the case,' with regard to the assessment of intangibles, such as witness credibility." Jastram v. Kruse, 197 N.J. 216, 230, 962 A.2d 503 (2008) (quoting Feldman v. Lederle Labs., 97 N.J. 429, 463, 479 A.2d 374 (1984)).
Applying that standard, the judge ruled that a new trial on damages was required for two reasons. First, "it [was] inconceivable" and her conscience was "totally" and "completely" shocked when the jury awarded no damages to John on his per quod claim, especially after it had found in plaintiffs' favor on liability, the presence of mesothelioma, and causation. Second, the jury's $100,000 award for future pain and suffering was shocking and "just does not make any sense ... no matter how [she] tried to reconcile" the calculation. Exxon now argues: the judge ignored the precept to consider the evidence in a light most favorable to the non-moving party and instead "made every effort to spin the evidence in favor of plaintiffs;" the jury's failure to award John damages was not the result of bias, prejudice or misapplication of the law, because the judge properly instructed the jury on loss of consortium; and a damage award for loss of consortium cannot be presumed based on the jury's finding of liability. We are not persuaded.
First, the facts that Exxon offers as examples of the judge's "spinning" the evidence during her analysis (i.e., Bonnie's visits with her granddaughter after her treatments, plaintiffs' decision not to move to North Carolina, and their not enjoying an Alaskan vacation) relate to events that occurred after Bonnie's diagnosis and not to future pain and suffering. Those facts do not eclipse the undisputed facts that, even when viewed in a light favorable to Exxon, Bonnie can no longer work in a job she loved and will eventually die painfully from mesothelioma.
Second, the judge heard ample evidence of John's losses. A spouse is entitled to loss of consortium upon showing of several factors, including a strong emotional reliance on each other, a relationship of long duration, and a high degree of mutual dependence. Dunphy v. Gregor, 136 N.J. 99, 112, 642 A.2d 372 (1994). "The severity of the loss is dependent on the quality of the pre-injury relationship. Impairment of the consortium includes not only the loss of the injured spouse's services but also its reciprocal burdening of the other spouse." Thalman v. Owens-Corning Fiberglas Corp., 290 N.J.Super. 676, 684, 676 A.2d 611 (App. Div.1996) (citation omitted).
The judge found that the first jury's failure to make any award for John's loss of consortium "shocks the conscience." We agree. The totality of the evidence reflects that plaintiffs were married for more than thirty years and shared a life of travel, camping, and other outdoor activities before Bonnie got sick. After her diagnosis and during treatment, John cared for her full-time, retired from his job to do so, and remained devoted to her. "[A] wife [or husband] may be compensated for having been transformed by a tortfeasor's negligence `from a loving wife [or husband] into a lonely nurse.'" Id. at 685, 676 A.2d 611 (quoting Ekalo v. Constructive Serv. Corp. of Am., 46 N.J. 82, 84, 215 A.2d 1 (1965)).
As for the alternative argument that a trial on all issues should have been granted rather that on damages only, we disagree. In a case involving an excessive jury verdict on damages, the Supreme Court declared:
[T]here is no logical reason why the size of a damages award, standing alone, *560 should invalidate an otherwise sound liability verdict. A "feeling" that something is amiss is an inadequate basis to upend an otherwise untainted verdict.
. . . .
To justify a new trial on all issues, what is required is trial error, attorney misconduct or some other indicia of bias, passion or prejudice, impacting on the liability verdict. In the absence of such indicia, a trial court faced with an excessive damages award can only order a new damages trial. ...
[Fertile, supra, 169 N.J. at 498-99, 779 A.2d 1078 (footnote omitted).]
An unjustly low damages verdict does not require retrial of liability when "the court is sure the lowness of the verdict is not part of a compromise upon liability." Purpura v. Pub. Serv. Elec. & Gas Co., 53 N.J.Super. 475, 478, 147 A.2d 591 (App. Div.), certif. denied, 29 N.J. 278, 148 A.2d 894 (1959).

Expert Testimony
Exxon contends that the judge erred by severely limiting Kerby's expert testimony. We disagree.
N.J.R.E. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Thus, an expert "must possess a demonstrated professional capability to assess the scientific significance of the underlying data and information, to apply the scientific methodology, and to explain the bases for the opinion reached." Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449, 593 A.2d 733 (1991). There are three basic requirements for admission of expert testimony:
(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
[DeHanes v. Rothman, 158 N.J. 90, 100, 727 A.2d 8 (1999) (citation and internal quotation marks omitted).]
Accord Polzo v. County of Essex, 196 N.J. 569, 582, 960 A.2d 375 (2008).
Trial judges have discretion to preclude an expert from testifying to opinions not contained in his or her report or in any other discovery material. Ratner v. Gen. Motors Corp., 241 N.J.Super. 197, 202, 574 A.2d 541 (App.Div.1990). Appellate courts use an abuse of discretion standard of review, Brenman v. Demello, 191 N.J. 18, 31, 921 A.2d 1110 (2007), and decisions should stand unless "so wide off the mark that a manifest denial of justice resulted." Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492, 734 A.2d 1147 (1999).
According to Kerby's 2006 deposition, to determine what Exxon knew at the time about asbestos, Exxon asked him to review epidemiologic studies regarding asbestos-related diseases in refineries and documents from its former employees, physicians, and industrial hygienists. He also reviewed plaintiffs' depositions, but not any medical reports. He opined that because Bonnie's survival rate was "far beyond the average," she "really has an ovarian carcinoma, some of which are mesothelioma, which are totally unrelated to asbestos. And that is the case of the majority of peritoneal mesotheliomas in women." However, he could not recall the exact title of any document, study, or article supporting his opinion. It had "been a while since [he] reviewed the topic," "probably *561 a year or two," but he noted that "there are gynecologic articles that suggest that the vast majority of peritoneal mesothelioma in women are not asbestos-related." He advised that "you can look up ovarian carcinoma and mesothelioma and probably find the same articles I read some years ago."
Kerby testified at trial that he was a specialist in internal medicine and pulmonary diseases and had published articles on pulmonary, not asbestos, topics. He was not an oncologist, had never diagnosed a peritoneal mesothelioma case, and always deferred "to the superior knowledge of the pathologist to make the diagnosis." Nonetheless, he considered himself an expert in cancer causation.
When plaintiffs objected to the judge's qualifying Kerby as an expert, Exxon announced that Kerby would offer his opinion that Bonnie was susceptible to ovarian cancer because she had had hormone therapy and because the diagnosis of ovarian cancer and mesothelioma overlap. Plaintiffs objected, and the judge declared that Kerby could not testify about the causes of peritoneal mesothelioma with regard to hormone therapy or ovarian cancer. Exxon protested the judge's limiting Kerby's testimony. The judge qualified him as an expert, but her reasoning and rulings are identified in the transcript as "indiscernible conversation." After Kirby finished testifying, the judge asked Exxon for another proffer. Exxon argued that Kerby should have been permitted to tell the jury that medical literature showed increased risk for ovarian cancer from hormone therapy. The judge affirmed her prior decision precluding Kirby from opining about ovarian cancer, (1) because his testimony would have been a net opinion and "would belie any expertise in ovarian cancer," (2) because plaintiffs could never cross-examine him on unnamed medical studies, and (3) because he had no expertise in medical diagnosis.
On appeal, Exxon argues that the judge abused her discretion by preventing Kerby from offering his opinion on the risk factors for ovarian cancer, peritoneal mesothelioma, and the misdiagnosis of asbestos-related diseases in women. Pointing to Kerby's curriculum vitae, experience, residency in internal medicine, awards, published articles, and previous expert witness appearances in other mesothelioma cases, Exxon asserts that he possessed sufficient credentials and experience to qualify him as an expert on those risk factors. Also, Exxon argues that Kerby was qualified to discuss issues relating to ovarian cancer, because "mere possession of a license to practice medicine ... imports some general competency to testify on all medical subjects." Carbone v. Warburton, 11 N.J. 418, 424-25, 94 A.2d 680 (1953).
An expert's opinion must, in all instances, be based on a proper factual foundation. Polzo, supra, 196 N.J. at 583, 960 A.2d 375; N.J.R.E. 703. An opinion that lacks such a foundation and consists of bare conclusions unsupported by factual evidence is inadmissible as a net opinion. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). This rule prohibits speculative testimony by requiring an expert to give the "why and wherefore" of his or her opinion, and not a mere conclusion. Creanga v. Jardal, 185 N.J. 345, 360, 886 A.2d 633 (2005).
We conclude that the judge did not abuse her discretion. Even if Kirby's license gave him some general competency to testify on all medical subjects, he did not have sufficient expertise to offer the intended testimony. DeHanes, supra, 158 N.J. at 100, 727 A.2d 8. Kerby acknowledged that he was not an expert in gynecology, was not epidemiologist or a pathologist, had done no epidemiological *562 research, had not published one article about asbestos, and had no experience with gynecological diseases or the diagnosis of ovarian cancer. In fact, although he read articles about peritoneal mesothelioma, he had never diagnosed a single case of that disease or of ovarian cancer. Further, without plaintiffs knowing the exact documents, studies, or articles on which he had relied, they could not have examined the accuracy of his opinions. Mauro v. Owens-Corning Fiberglas Corp., 225 N.J.Super. 196, 206, 542 A.2d 16 (App.Div.1988), aff'd o.b., 116 N.J. 126, 145, 561 A.2d 257 (1989).
Finally, Kirby's opinions were net opinions because he had not reviewed Bonnie's medical history or examined her and could not recall the specific identity of any documents that had supported his opinions on ovarian cancer. In fact, according to Moline, who had reviewed Bonnie's medical records, no cancer was found during her oophorectomy and total abdominal hysterectomy, and she could not have developed ovarian cancer after her ovaries had been removed.
This case is not analogous to the cases cited by Exxon, as the experts in those cases, unlike Kerby, could cite to the studies they had relied on for their opinions. See Landrigan v. Celotex Corp., 127 N.J. 404, 418, 605 A.2d 1079 (1992) (expert used landmark study); Carbone, supra, 11 N.J. at 426, 94 A.2d 680 (expert specified several texts by name).
In summary, we reject all of Exxon's contentions. The judgment is affirmed.