# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5432-16T3
                A-5433-16T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

v.

N.M.Y. and J.D.M., Jr.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GURADIANSHIP OF C.J.M.,

     a Minor.

_____

Argued telephonically October 10, 2019[1] –
Decided November 8, 2019

Before Judges Fasciale, Rothstadt and Mitterhoff.

---

[1] We originally scheduled oral argument for October 21, 2019, but due to a scheduling conflict of one of the attorneys, we held telephonic oral argument on October 10, 2019.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0067-16.

Patricia A. Nichols, Designated Counsel, argued the cause for appellant N.M.Y. (Joseph E. Krakora, Public Defender, attorney; Patricia A. Nichols, on the briefs).

Beryl Vurnen Foster-Andres, Designated Counsel, argued the cause for appellant J.D.M., Jr. (Joseph E. Krakora, Public Defender, attorney; Beryl Vurnen Foster-Andres, on the briefs).

Alexa L. Makris, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Alexa L. Makris, on the brief).

Lisa Marie Black, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Lisa Marie Black, on the brief).

PER CURIAM

N.M.Y. (the mother) and J.D.M., Jr. (the father) (collectively defendants) appeal from a July 31, 2017 order terminating their parental rights to C.J.M. (the child), and awarding guardianship in favor of the Division of Child Protection

and Permanency (the Division). The judge conducted a lengthy trial, entered judgment, and rendered a thorough eighty-three page written decision.[2]

On appeal, the mother argues:

> POINT I
> THE [JUDGE'S] ABUSE OF DISCRETION IN REPEATEDLY REFUSING TO CONDUCT THE BEST INTERESTS PLACEMENT REVIEW HEARING, REQUESTED NUMEROUS TIMES BY COUNSEL FOR [DEFENDANTS] AND THE LAW GUARDIAN THROUGHOUT TWO YEARS OF LITIGATION, WAS OF SUCH MAGNITUDE AS TO PREJUDICE [DEFENDANTS] AND ADVERSELY IMPACT THE OUTCOME OF THE GUARDIANSHIP TRIAL.
>
> POINT II
> LIMITING DEFENSE EXPERTS WAS AN ABUSE OF DISCRETION.
>
> A. Dr. Figurelli
>
> B. Dr. Quintana
>
> POINT III
> THE [JUDGE'S] OPINION FAILED TO SATISFY R[ule] 1:7-4 AS IT DID NOT CONTAIN FINDINGS OF FACT OR CONCLUSIONS OF LAW CONSISTENT WITH EITHER THE TRIAL EVIDENCE OR THE RELEVANT STATUTORY AND CASE LAW IN ORDER TO JUSTIFY AN AWARD OF GUARDIANSHIP TO PLAINTIFF. IN

---

[2] During a limited remand, the judge rendered a written opinion and related order dated August 14, 2018, which clarified part of the evidence and concluded that there was no spoliation of evidence.

A-5432-16T3

ADDITION, THE [JUDGE] ERRONEOUSLY TRIED TO FIT THE SQUARE PEG OF FAMILIES IN NEED OF SERVICES INTO THE ROUND HOLE OF BEST INTEREST OF THE CHILD GUARDIANSHIP. (Partially Raised Below).

A. The Rights And Interests Of Families In Need Of Services Are Not Properly Adjudicated In The Crucible Of [The] [Four]-Prong Best Interest Analysis.

B. Families In Need Of Services Do Not Have The History Of Harm Or Fault Required For The [First] Prong.

C. Families In Need Of Services Are Not Required To Cure Family Needs As Under The [Second] Prong.

D. Families In Need Of Services Are Entitled To More, And More Effective, Reasonable Efforts Than Required For The [Third] Prong.

E. Families In Need Of Services, Without The Reasonable Efforts Contemplated Under That Statute, Are Impeded, By Plaintiff, From Achieving A Bond That Would Survive [The] [Fourth] Prong Analysis.

On appeal, the father argues:

POINT I
THE JUDGE CLEARLY ERRED IN FAILING TO ADMIT THE FOSTER FATHER'S RACIST AND VIOLENT FACEBOOK POSTS INTO EVIDENCE.

POINT II
THE JUDGE CLEARLY ERRED IN ADMITTING DR. LEE'S TESTIMONY BASED ON THE RORSCHACH TEST.

4

POINT III

THE JUDGE ERRONEOUSLY RULED THAT THE FOUR PRONGS OF THE BEST INTERESTS TEST FAVORED TERMINATION OF PARENTAL RIGHTS WHERE THE EVIDENCE SHOWED THAT [THE CHILD] WAS BONDED WITH [THE FATHER] AS WELL AS THAT [THE FATHER] WAS A GOOD FATHER, SUCCESSFULLY COMPLETED NUMEROUS SERVICES, NEVER CONSUMED ANY ILLICIT SUBSTANCES, HAD A STABLE JOB AND INCOME, AND WAS PREVENTED FROM COMPLETING THE LIVING WITH CHILDREN EVALUATION WHILE THE FOSTER FATHER IS AN ACTIVELY USING ALCOHOLIC AND RACIST AND BOTH FOSTER PARENTS WERE UNEMPLOYED.

A. The Judge's First Prong Finding Was In Error Because Neither Parent Ever Harmed This Child, Each Had Enrolled In And Successfully Completed A Litany Of Services, Did Not Use Any Illicit Substances Through The Duration Of The Matter, There Was No Reason To Believe [The Father] Had A Proclivity Towards Criminal Recidivism, Their Interactions With This Child Were At All Times Nurturing And Safe, And The Judge Relied Heavily On Dr. Lee's Unsupported Opinions.

B. DCPP Failed To Prove The Second Prong Of The Best Interests Test Because [The Father] Completed Domestic Violence Counseling, Refrained From Any Illicit Substances, Was Bonded To His Son, And Was An Adequate Parent.

C. DCPP Did Not Satisfy The Third Prong Of The Best Interests Test Because It Failed To Place The Boy With His Aunt And Uncle, Refused To Bring Him For The Living With Children Evaluation, And Failed To

5

Investigate The Foster Father's Racist And Violent Facebook Posts.

D. DCPP Failed To Prove The Fourth Prong Of The Best Interests Test Because The Father Has Properly Addressed Any Substance Issues As Well As His Past Crime, Has A Stable Home, Employment, And Relationship, While The Foster Parents Do Not Work, Face Severe Financial Hardships, Would Cut The Boy Off From All His Family, And The Foster Father Will Be Nearly [Eighty] By The Time [The Child] Is Finishing High School, Is Racist, Endorses Violence, And Is An Alcoholic While Still Actively Consuming Alcohol.

I.

We begin our discussion with the well-settled legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test to determine when it is in the child's best interest to terminate parental rights. In order to secure parental

6

termination, N.J.S.A. 30:4C-15.1(a) requires the Division to prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

> (4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11. The four prongs of the test are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the

A-5432-16T3

specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

Our review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 413 (1998). "When a biological parent resists termination of his or her parental rights, the [judge's] function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006). The factual findings that support such a judgment "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

## II.

We now turn to defendants' argument that the judge erred in finding that the Division proved each of the four prongs under the best interests test by clear

and convincing evidence. We disagree with defendants' contentions, and as to the four prongs, we affirm substantially for the reasons given by the judge. We add the following.

A.

The first prong requires the Division to prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "Although a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "[T]he attention and concern of a caring family is 'the most precious of all resources.'" In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) (quoting A.W., 103 N.J. at 613). "[W]ithdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Ibid.

The judge found that the mother was unable to provide for the child's health, safety, and development based on her failure to address her substance abuse issues. In reaching this conclusion, the judge relied on bonding evaluations and expert testimony from psychologists retained by both the Division (Dr. Alan Lee) and defendants (Dr. John Quintana). Indeed, the

9

Division removed the child from the home when he was just over three months old, in part, because the mother tested positive for Suboxone (a controlled dangerous substance), and because it received referrals that defendants sold drugs out of their home, in which others allegedly overdosed. Thus, the Division satisfied prong one as to the mother.

The father also was unable to provide for the child's health, safety, and development. In support of that finding, the judge determined that his personality traits—anger, resentfulness, and self-centeredness—and his domineering, manipulative, and aggressive behaviors adversely impacted his overall functioning. Dr. Lee provided these diagnostic impressions, and Dr. Quintana agreed the father suffered from maladaptive judgment and personality traits, including risk of substance abuse problems. Moreover, the father, a Megan's Law offender, violated his parole conditions when he lived with the child. The father's failure to address these issues prolonged his out-of-home placement, which in itself is a harm. See D.M.H., 161 N.J. at 379 (noting "withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child"). Thus, the Division satisfied prong one as to the father.

We emphasize, as to prong one, that the Division can meet its burden by showing conduct "detrimental to the physical or mental health of the child . . . in the form of actual or imminent harm." A.W., 103 N.J. at 616 (emphasis added). "[T]he cornerstone of the inquiry is not whether the biological parents are fit but whether they can cease causing their child harm." J.C., 129 N.J. at 10. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." D.M.H., 161 N.J. at 383. "[A]ny question of the parental role is oriented only to the prediction of the future condition of the child. Parental behavior is relevant only insofar as it indicates a further likelihood of harm to the child in the future." A.W., 103 N.J. at 615-16. Contrary to the father's contention, the standard is not whether the parents have caused harm, but "whether it is reasonably foreseeable that the parents can cease to inflict harm[.]" N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting A.W., 103 N.J. at 607). Here, the judge found otherwise.

B.

The second prong of the best interests test requires the Division to present clear and convincing evidence that "[t]he parent is . . . unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The relevant

inquiries for the judge are whether the parent cured and overcame the initial harm that endangered the child, and whether the parent is able to continue the parental relationship without recurrent harm to the child. K.H.O., 161 N.J. at 348-49. To satisfy its burden, the Division must show continued harm to the child because the parent is unable or unwilling to remove or overcome the harm. N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012). The first and second prongs relate to one another, and often, "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

"Parental unfitness may also be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). "Keeping [a] child in limbo, hoping for some long term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

As to prong two, the judge found—relying on Dr. Lee's testimony—that the mother was incapable of providing even minimally adequate care to the child. And the judge accepted testimony from the Law Guardian's psychologist

(Dr. Gregory Gambone) that the mother did not have a significant bond with the child, which led the judge to conclude the mother, as opposed to the resource parents, was incapable of providing permanency. Dr. Lee opined that the child had an "ambivalent and insecure attachment" to the mother, and Dr. Quintana testified that the mother was "presently incapable of appropriately and safely caring for [the child]." These experts said the mother was unable to provide a safe and stable home for the child. The mother also failed to participate in court-ordered substance abuse treatment and individual counseling, and she did not intend to complete those services. Thus, the Division satisfied prong two as to the mother.

Like the mother, the judge found that the father was unable or unwilling to correct the circumstances that led to the child's removal. The father was unable to provide a safe and stable home, in part because he did not complete recommended services, including domestic violence counseling, court-ordered substance abuse treatment, and a living with children evaluation (LWC). Relying on Dr. Lee's testimony, the judge found that the father had a poor prognosis for significant and lasting change, and that the father presented ongoing concerns about his ability to parent. Thus, the Division satisfied prong two as to the father.

The father contends he engaged in a "litany of services," including five years of sex offender therapy. Regarding the LWC assessment, he argues that a Division caseworker did not offer to bring the child for phase three of the evaluation, and that the caseworker denied his request to bring the child to the evaluation to complete the assessment. He asserts there was no evidence that he was violent in the past nor that he needed drug treatment.

As a condition of parole, the father was required to finish the LWC evaluation before he could legally reside with the child. The primary cause of the child's removal was the father's failure to complete the LWC. Four months after his removal, at a fact-finding hearing, the father averred he completed the LWC assessment and only needed the Division's assistance to pay the fee to obtain the final report. Seven months after that, and after the court ordered the Division to pay a share of the LWC fee, the father's parole officer notified the Division that he did not start the three-step LWC assessment. The father contested this, stating that he completed the second step of the LWC process in September 2015 and only needed to complete the third step—a session with the child. He alleged that he tried to set the session up, but was unable to, because a Division caseworker told him the session could not happen. The record does

14

not contain this correspondence. As of trial, the father still did not complete the evaluation.

The father missed at least six substance abuse treatment appointments between October 2015 and January 2016, despite being ordered to attend. The judge issued three more orders directing the father to undergo substance abuse treatment and evaluation, yet, on September 1, 2016, the substance abuse treatment was terminated for noncompliance when the father failed to access "any services despite numerous attempts by [the] agency." Thus, there is ample evidence that he did not meaningfully engage in drug treatment and other services. See N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 112 (App. Div. 2004).

Moreover, we reject the father's general assertion that the judge erred by relying on Dr. Lee's findings rather than adopting Dr. Quintana's conclusions. Although he does not specify which of Dr. Quintana's conclusions, in context, it appears the father is referencing Dr. Lee's testimony on two subjects: (1) the existence of a secure bond and attachment between the father and the child; and (2) the father's risk of reoffending, notably another sex offense.

Dr. Lee did not contend, as the father implies, that the length of time the child spent in foster care was dispositive as to defendants' bond with the child.

15

Dr. Lee conducted six bonding evaluations, and he based his conclusions on observations from those evaluations and on review of the case record. During the bonding evaluation with the father, the child showed little emotion, was nonverbal, tried to leave the room twice, and did not appear happy. This led Dr. Lee to conclude the child lacked a significant, positive attachment to the father. Dr. Lee found, by contrast, that the child's bond with his resource parents was positive and enthusiastic.

It is true that Dr. Quintana made different observations. During his own bonding evaluation, conducted about three months after Dr. Lee's evaluation, he observed that the child was very happy to see the father, engaged with him, and hugged him. He called him "father" and listened when the father asked him to help clean. Based on this, Dr. Quintana concluded that the father was a significant parental figure to the child.

In favoring Dr. Lee's testimony over Dr. Quintana's, the judge relied, in part, on Dr. Gambone's conclusion about the strength of the child's bond with the resource parents. Dr. Gambone testified, similar to Dr. Lee, that the child formed a positive emotional attachment with his resource parents and had an "enduring cognitive and emotional dependence" on them.

A-5432-16T3

Faced with two experts testifying about dissimilar observations made during separate bonding evaluations, the judge found that Dr. Lee's and Dr. Gambone's opinions were more credible than Dr. Quintana's. We defer to that finding, N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012), and there is ample support for the judge's finding in the record. C.S., 367 N.J. Super. at 112. Moreover, Dr. Quintana—like the other experts—agreed that the child had a "good relationship" with the resource parents and was comfortable with them.

As to the court's finding that the father had a heightened risk of recidivism, the judge credited Dr. Lee's opinion that the father had a heightened level of anger, resentment, impulse control, emotional reactivity, and substance abuse issues. Dr. Lee's findings were supported by both Dr. Quintana's testimony and the Division's records. Indeed, the father admitted to Dr. Quintana that he exhibited poor judgment because of his anger and impatience issues.

As to his history of crime, the father was arrested as a juvenile on a weapons possession charge, for which he received probation, and as an adult, he was convicted of two third-degree offenses: burglary in 2009 and endangering the welfare of a child in 2011. For the latter offense, defendant is subject to parole supervision for life and is classified as a Tier II sex offender under

17

Megan's Law. The father violated parole in 2012 and was convicted of obstructing the administration of law in 2016.

Dr. Quintana diagnosed the father with an unspecified personality disorder with antisocial personality traits. Although the father attended anger management training, at the time of trial, Dr. Quintana still recommended the father make further efforts to address his impulsive behavior and anger issues prior to reunification. In April 2015, the Division received a referral alleging the father yelled at the mother and was aggressive towards her. In a January 2016 contact sheet, the Division also documented an incident in which the father was reportedly "irate" and yelling outside a relative's home that the mother was staying in, leading to police involvement.

Although the father contends he complied with his parole conditions, the Division's March 3, 2016 contact sheet demonstrates that his parole officer reported that he was somewhat compliant because he submitted clean urine screens, but he "missed quite a few sessions" at his drug treatment facility. The officer concluded the father was therefore "on thin ice." Moreover, as a condition of the father's parole, he could not have unsupervised overnight contact with any children, including his own, until he completed the LWC evaluation. But he lived with the child and his mother in defiance of his parole

conditions.  At the time of judge's decision, when the child was thirty months old, the father still did not complete the program.

As to the father's risk of sexually reoffending, Dr. Lee noted that a Tier II Megan's Law offender equates to a "moderate risk" of committing another sexual offense. This opinion reinforced the importance of the father complying with all of his parole conditions.  See, eg., In re N.B., 222 N.J. 87, 92 (2015) (noting that Tier II offenders "present[] a moderate risk of re-offense").  Thus, as to the second prong, the judge's findings are supported by adequate credible evidence.  C.S., 367 N.J. Super. at 112.

C.

As to prong three, N.J.S.A. 30:4C-15.1(a)(3) requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home," and the court to "consider[ ] alternatives to termination of parental rights[.]"  The judge found that the Division provided defendants with a "plethora of services," which we need not repeat here.  The Division met prong three.  The judge also determined that the Division adequately assessed the child's placement with paternal relatives, which we will address.

A-5432-16T3

"In reviewing a child's placement, courts must determine whether 'such placement ensures the safety and health and serves the best interest of the child.'" N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 528 (App. Div. 2003) (quoting N.J.S.A. 30:4C-51). The child's best interests "is always the polestar in such matters." N.J. Div. of Child Prot. & Permanency v. C.S., 432 N.J. Super. 224, 229 (App. Div. 2013). Although the Division has a statutory duty to evaluate relatives as potential caretakers, there is no presumption that favors the child's placement with such relatives. See N.J.S.A. 30:4C-12.1; N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 81-82 (App. Div. 2013). Nevertheless, the Division evaluated paternal relatives, despite their inconsistent interest and substantial problems with such placement.

The Division removed the child from defendants' home in April 2015. That month, a caseworker visited the house of paternal relatives (the father's brother and his girlfriend) and discussed the possibility of placing the child with them. That option failed because the girlfriend was not interested and was otherwise overwhelmed with the licensing process. However, the Division continued pursuing these paternal relatives as a possible placement option.

In July 2015, the Division contacted the paternal relatives asking if they were interested in being a summer vacation placement for the child. The

girlfriend said they could not be such a placement option, and that they were not interested in subjecting their children to contact with the Division. The caseworker advised the paternal relatives to contact the Division if they changed their minds.

In November 2015, the paternal relatives contacted the Division and expressed an interest in being a placement option for the child. The girlfriend learned that the Division was assessing their home for the child's placement. In January 2016, the Division informed the judge about the paternal relatives' interest, but indicated that it requested police reports due to concerns emanating from their background checks. The brother had a criminal drug possession charge.

Later that month, the paternal relatives advised the caseworker that they changed their minds and were no longer interested in being a placement option for the child. The girlfriend expressed concerns about the father's behavior, which the brother characterized as looking "psychotic," and the brother did not want to expose his family to such behavior. And the girlfriend indicated that it would not be in the best interest of the child to place him with them. The caseworker conveyed concern that the paternal relatives waivered in their willingness to be caretakers for the child. Indeed, at the end of January 2016,

21

the paternal relatives were unwilling to supervise visits between defendants and the child.

In March 2016, the Division informed the judge (at a permanency hearing) that it was still assessing the paternal relatives as a possible placement option. The Division required the paternal relatives to undergo bonding evaluations, visitation with the child, and licensing. The Division required these things because it was concerned that the paternal relatives consistently waivered on their willingness to have the child placed with them.

At this point, the mother informed the Division she was no longer interested in completing services, but instead, wanted the child placed with the paternal relatives.[3] In January 2017, Dr. Lee advised that it would not be in the best interest of the child to remove him from his resource parents. And around this time, the girlfriend again expressed she was overwhelmed with the licensing process. The Division then determined that it would not be in the best interest of the child to place him with the paternal relatives.

In April 2017, the paternal relatives filed an application for custody of the child. The judge conducted the FG trial over the course of ten days in May 2017.

---

[3] In December 2016, the mother gave birth to a different child (who is not involved in this appeal). The Division performed a Dodd removal as to that child, placing the child in a different resource home.

A-5432-16T3

During the trial, the judge performed a best interest of the child analysis to determine the outcome of the paternal relatives' private custody application. The Division offered testimony from witnesses, who testified as to the history of the Division's efforts to place the child with the paternal relatives, and the paternal relatives' inconsistent responses. The paternal relatives also testified, although the judge placed greater weight on the documentary evidence than their testimony. Indeed, as the judge noted, the paternal relatives minimized a domestic incident in January 2016 involving the father: "[t]heir testimony was in clear contrast to the narrative that they presented to the Division," and the incident led the paternal relatives to stop supervising visits with the child for ten months. The judge found the Division's witnesses more credible than defendants' testimony, especially after considering expert testimony. And the judge significantly relied on the testimony from the experts for the Division and Law Guardian (Dr. Lee and Dr. Gambone), rather than the experts for defendants (Dr. Quintana and Dr. Gerald Figurelli).

Defendants contend that the paternal relatives requested that the Division place the child with them in the early phases of the FN litigation. That never occurred, and at the time the judge terminated the FN litigation, defendants did not seek reconsideration or appellate review on that issue. Moreover, the

paternal relatives declined to be a placement option during the fact finding hearing. Although defendants argue that they desired placement of the child with the paternal relatives throughout the FG case, the record demonstrates the paternal relatives waivered, which led to the Division's concerns and subsequent licensing process. Further, the judge rejected the paternal relatives' testimonies that the Division delayed its placement evaluation and that the Division misinformed them. It is clear to us that the Division ruled out the paternal relatives because, as the judge found, it was not in the best interest of the child to place him with them.

Finally, as to prong three, the father provides no support for his claim that a Division caseworker told him that the Division would not bring the child for the third phase of the LWC evaluation. On the contrary, the record shows a long history in which the father failed to complete the LWC process. The judge found the father's testimony was contradicted by the record and was not credible, and this finding is entitled to deference. C.S., 367 N.J. Super. at 112. Given that the father had to complete the LWC assessment for reunification to occur, and failed to do so for more than two years, the judge was justified in rejecting the claim that it was the Division's fault the father did not complete it.

## D.

The fourth prong of the best interests test requires a determination that the termination of parental rights "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The court must ask whether "after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than from the permanent disruption of [his] relationship with [his] foster parents." K.H.O, 161 N.J. at 355. This prong "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. "The overriding consideration under this prong remains the child's need for permanency and stability." L.J.D., 428 N.J. Super. at 491-92. "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." C.S., 367 N.J. Super. at 111.

As to the fourth prong, the judge credited Dr. Lee's and Dr. Quintana's testimonies that the mother should not be the child's caretaker. And the judge further credited Dr. Gambone's opinion that the child was dependent on the

A-5432-16T3

resource parents for protection, guidance, and nurturance. Dr. Gambone found that the child responded to the resource parents, and he had a strong, positive, consistent state of emotional security with them. Relying on this expert testimony, the judge found the termination of parental rights would not cause more harm than good.

The mother argues that the judge erroneously used a "comparative" standard in his analysis rather than analyzing whether termination will not do more harm than good. The mother contends that such a comparison ignores social science on the detriments of separation and adoption. The judge relied on the experts' conclusions that the mother, unlike the resource parents, was incapable of caring for the child. That testimony was offered, not in support of why placement in the resource home was better than placement in defendants' home, but rather to show how the child would suffer if his relationship with the resource parents was severed and he was returned to a caretaker who was unable to meet his needs. Specifically, the judge credited Dr. Lee's and Dr. Gambone's testimonies that removing him from the resource home created a risk that he would suffer severe and enduring harm. The judge may rely on such opinions to find that the Division met its burden under prong four. N.J. Div. of Child

Prot. and Permanency v. P.D., 452 N.J. Super. 98, 122 (2017). Therefore, the Division satisfied its burden on prong four as to defendants.[4]

Moreover, the judge found that Dr. Lee's recommendation focused on permanency. Dr. Lee was concerned about various aspects of the child's life, including the father's substance abuse history, criminal history, and his entrenched and maladaptive personality and character traits. Dr. Lee recommended that the father undergo a comprehensive substance abuse evaluation, frequent random drug tests, anger management, individual therapy, and sex offender treatment. But Dr. Lee recommended not delaying permanency because in his opinion, the father had a poor prognosis for significant, lasting change. Dr. Quintana similarly believed it was not in the child's best interest to place him in the father's custody right away and, and although he recommended that the father complete several services, Dr. Quintana stated that a long delay of permanency would be a concern.

The father contends that there was no evidentiary support for the judge's findings regarding his substance abuse history, criminal history, or maladaptive personality traits. But he himself testified that, as an adult, he was convicted of

---

[4] We note that the court appointed special advocate indicated that after an August 10, 2018 visit, the child seemed to be a "very happy toddler," and that the resource parents loved the child and wanted to adopt him.

two criminal offenses and once violated parole, and he admitted using Suboxone in 2015 to curtail his addiction to another drug. Both Dr. Lee and Dr. Quintana found that the father had "maladaptive personality traits." Dr. Quintana also noted that maladaptive behavioral patterns can be at times difficult to treat, and that the father would need to undergo additional counseling to better deal with his judgment, problem-solving, frustration tolerance, impulsive behavior, and anger issues.

Finally, with respect to the father's claims about the resource parents' fitness, the focus of prong four is not the resource parents' fitness, but "whether the child will suffer a greater harm from the termination of ties with the natural parent than from the permanent disruption of the child's relationship with the foster parent[s]." N.J. Div. of Child Prot. & Permanency v. A.S.K., 457 N.J. Super. 304, 329 (App. Div. 2017), aff'd o.b., 236 N.J. 429 (2019). Nevertheless, the father's claims fail to account for expert testimony regarding the strength of the child's ties with his resource parents as primary caretakers, which is the paramount consideration under prong four.

III.

We reject the mother's argument, raised for the first time, that the judge applied the wrong statutory standard by permitting the guardianship petition to

proceed towards termination of parental rights. We apply a de novo standard because her contention raises a legal question.

The Division withdrew its request for relief in its FN matter—brought under N.J.S.A. 9:6-8.21—and at the same time, defendants stipulated they were in need of services including substance abuse treatment, parenting classes, and counseling. These services were necessary to ensure the health, safety, and welfare of the child and a prerequisite to reunification. The judge found the stipulations were credible and continued the Division's custody of the child under N.J.S.A. 30:4C-12.

N.J.S.A. 30:4C-12 provides, in pertinent part, that a court may issue an order granting the Division's request for care, supervision, and custody if the Division established the child requires care and supervision "to ensure the health and safety of the child" and "the best interests of the child so require[.]" In cases brought under N.J.S.A. 30:4C-12, "the court applies the well-established standard of the best interest of the child." N.J. Div. of Child Prot. & Permanency v. M.C., 456 N.J. Super. 568, 584 (App. Div. 2018). But N.J.S.A. 30:4C-15 broadly allows the Division to initiate termination proceedings "as soon as any one of the circumstances in subsections (a) through (f)" of the statute "is established." Relating to this case, subsection (c) pertains to "the best interests

of [the] child," and subsection (d) pertains to when a parent "has failed for a period of one year to remove the circumstances or conditions that led to removal[.]" N.J.S.A. 30:4C-15(c), (f).

The mother contends that because defendants stipulated to the need for services, the dismissal of the Title 9 action should have led the court to adjudicate the Title 30 matter under N.J.S.A. 30:4C-15(d). She argues that the statute applies to families in need of services to correct the circumstances that led to a child's removal. Thus, the mother asserts that the judge should have adjudicated the Title 30 matter under N.J.S.A. 30:4C-15(d), rather than under the "best interest" factors of N.J.S.A. 30:4C-15(c) and N.J.S.A. 30:4C-15.1(a), which apply to other guardianship proceedings. She argues that the judge erred by considering only the "best interest" factors and not the "elements" of N.J.S.A. 30:4C-15(d), which include reasonable efforts to strengthen the parental relationship and to assist defendants in eliminating the circumstances that led to removal. Defendants also claim the judge lacked a "foundation for the four prongs of the best interest test" because there were viable relatives willing to adopt the child.

Although the Division's efforts to comply with its statutory obligations are relevant considerations for a judge's assessment of the best interests factors

at a guardianship trial, that has no effect on the Division's separate statutory obligation to file a petition for the termination of the parental rights under N.J.S.A. 30:4C-15(a) to (f). The plain language of N.J.S.A. 30:4C-15(f) directs the Division, after obtaining custody, to bring an action to terminate parental rights "as soon as any one of the circumstances in subsections (a) through (f)" is established. The Division may initiate a petition to terminate parental rights under N.J.S.A. 30:4C-15(c) if the four "best interests" prongs are met. N.J.S.A. 30:4C-15.1(a). The Division may move to terminate parental rights under N.J.S.A. 30:4C-15(d) when "it appears that a parent or guardian . . . has failed for a period of one year to remove the circumstances or conditions that led to the removal or placement," despite the Division's "reasonable efforts . . . to encourage and strengthen the parental relationship" and to "assist the parent or guardian in remedying the conditions[.]" The Division met those conditions here.

Once defendants stipulated to the Division's right to obtain custody, as they were a family in need of services, "the Division is authorized to temporarily remove children from the home of their parents or guardians to avert the child's abuse and neglect . . . or when the child's best interests are not secured by their parents who are in need of services[.]" N.J. Div. of Youth & Family Servs. v.

31

D.P., 422 N.J. Super. 583, 593 (App. Div. 2011). In its guardianship complaint, filed on May 3, 2016, more than one year after the Dodd removal, the Division alleged it was in the child's best interest to be placed in its custody, setting forth the grounds under N.J.S.A. 30:4C-15(c). The complaint also alleged that despite the Division's reasonable efforts, defendants were unwilling or unable to eliminate the harm that led to the child's removal within one year, as set forth in N.J.S.A. 30:4C-15(d). The Division alleged that because defendants failed to make a permanent plan for the child or to engage in recommended services, returning the child to defendants' care would expose him to an unacceptable risk of harm.

Upon filing the FG complaint and seeking to terminate defendants' parental rights, the four prongs of N.J.S.A. 30:4C-15.1(a) provide the "integrated multi-element test that must be applied to determine whether termination of parental rights is in the best interests of the child." D.M.H., 161 N.J. at 375. The statutory scheme provides no safe harbor, or alternative track, when FG complaints for guardianship involve a family in need of services under N.J.S.A. 30:4C-12. Because the Division's petition alleged sufficient grounds that justified moving for termination of parental rights under N.J.S.A. 30:4C-

15(c) and (d), the Division correctly moved towards terminating defendants' parental rights.

IV.

Defendants argue the judge erroneously allowed testimony from Dr. Lee, limited their experts' testimonies and excluded Facebook posts from the resource father. We review these contentions for abuse of discretion. N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016). We reverse discretionary determinations, as with all rulings on the admissibility of evidence, only "when the trial judge's ruling was 'so wide of[f] the mark that a manifest denial of justice resulted.'" N.J. Div. of Youth & Family Servs. v. M.G., 427 N.J. Super. 154, 172 (App. Div. 2012) (quoting State v. Carter, 91 N.J. 86, 106 (1982)).

As to Dr. Lee, the judge admitted him as an expert in clinical and forensic psychology. The judge found that there was ample basis for Dr. Lee's opinions, even if the judge were to "discount all of the formalized testing measures," including the Rorschach test. The judge acknowledged that defendants' experts expressed concerns about "how the scoring was done" on the Rorschach test in Dr. Lee's report, but he discounted these concerns because the defense experts did not "provide testimony that the test itself yielded unfounded results."

The general non-exhaustive factors for a judge to consider in deciding whether expert testimony should be permitted include:

> 1) Whether the scientific theory can be, or at any time has been, tested;
>
> 2) Whether the scientific theory has been subjected to peer review and publication, noting that publication is one form of peer review but is not a "sine qua non";
>
> 3) Whether there is any known or potential rate of error and whether there exist any standards for maintaining or controlling the technique's operation; and
>
> 4) Whether there does exist a general acceptance in the scientific community about the scientific theory.
>
> [In re Accutane, 234 N.J. 340, 398 (2018).]

These standards apply in Family Part proceedings. N.J. Div. of Child Prot. & Permanency v. V.F., 457 N.J. Super. 525, 535 (App. Div. 2019).

"'[T]he admissibility of scientific evidence may turn not only on its reliability but the purpose for which it is offered.'" N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 596 (App. Div. 2015) (quoting State v. Hines, 303 N.J. Super. 311, 318 n. 1 (App. Div. 1997)). "'[T]he usefulness of expert testimony depends in part on the context in which it is offered. Testimony may be more helpful than prejudicial in one context, because it is being used for

34

a limited purpose or because the factfinder knows its limitations.'" Ibid. (quoting Hines, 303 N.J. Super. at 526 n. 8).

Where the Division seeks to terminate parental rights due to "potential harm to the child based on separation from a foster parent with whom the child has bonded," the proofs "should include the testimony of a well[-]qualified expert[.]" J.C., 129 N.J. at 18-19. "Family Part judges regularly qualify experts in psychology and psychiatry and hear the opinion testimony those experts offer in a variety of contexts." I.B., 441 N.J. Super. at 596. Because of their "special expertise" in ensuring the welfare of children, Family Part judges "are more than capable of evaluating the opinions of experts and understanding the limitations of behavioral science testimony in a way untrained jurors may not." Ibid. "[S]o long as the proffered testimony meets the requirements of N.J.R.E. 702," the court's evaluation of expert testimony "should be directed to the weight and not the admissibility of the testimony." Id. at 596-97.

The judge relied on Dr. Lee's sufficient foundation to find the results of the Rorschach test scientifically reliable. Specifically, the results were found valid and scientifically reliable in multiple prior cases, and Dr. Lee taught a university course on how to administer the test. Although defendants' experts testified that they could not tell from Dr. Lee's report what he was relying on

when scoring the results of the Rorschach test, these concerns went to the weight of the testimony, not its admissibility.  I.B., 441 N.J. Super. at 596-97.

Moreover, Dr. Lee noted that his testing was not in isolation, but "in the context of other data," such as from interviews with defendants and reviews of the collateral history.  The judge noted that Dr. Lee's conclusions were informed by "significant collateral data," including defendants' interviews with Dr. Lee, and their failure to engage in court-ordered services.  This led the judge to "discount" the formalized testing measures that Dr. Lee used, and for the judge to find that the Division satisfied its statutory burden.  Furthermore, even Dr. Quintana—the father's expert—testified that he did not support reunification with the child.

Finally, the judge correctly recognized that the Rorschach test results related mainly to Dr. Lee's psychological assessments of defendants and had no bearing on Dr. Lee's bonding evaluations, which were critical to Dr. Lee's conclusion that severing the child's relationship with his resource family posed a "significant risk of the child suffering severe and enduring psychological or emotional harm."  The judge relied on this conclusion to analyze the "best interests" prongs of N.J.S.A. 30:4C-15.1(a).

As to Dr. Quintana, in the midst of the guardianship trial, and on the date of a scheduled sibling visit at the paternal relatives' home, defendants arranged for him to conduct a second bonding evaluation of the child with the paternal relatives. The judge excluded Dr. Quintana's supplemental report and testimony regarding that mid-trial bonding evaluation. The judge excluded the supplemental report and testimony on fundamental fairness grounds, finding that defendants had "a design to mislead" and conceal the bonding evaluation from the Division and the Law Guardian, who were surprised the evaluation occurred. The judge also concluded it would be prejudicial to permit a second round of bonding evaluations during the trial.

"[A] trial judge has the discretion to preclude expert testimony on a subject not covered in the written reports furnished in discovery." Ratner v. Gen. Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990); accord Anderson v. A.J. Friedman Supply Co., 416 N.J. Super. 46, 72 (App. Div. 2010). "Expert testimony that deviates from the pretrial expert report may be excluded if the court finds 'the presence of surprise and prejudice to the objecting party.'" Conrad v. Robbi, 341 N.J. Super. 424, 440 (App. Div. 2001) (quoting Velazquez ex rel. Velazquez v. Portadin, 321 N.J. Super. 558, 576 (App. Div. 1999)). Dr. Quintana's excluded supplemental report mainly reinforced his earlier testimony

from his December 2016 bonding evaluations; therefore it was doubtful the report "would have been a heavy weight in the evidential balance," had the court considered it. Ratner, 241 N.J. Super. at 203.

As to the Facebook posts, we see no abuse of discretion. The judge noted that the posts pertained to the resource parents and were obtained through unsuccessful mediation efforts. The judge therefore struck the social media pages from the record.

To the extent that we have not addressed the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5432-16T3